

Attorney for Plaintiff
Royce Keith Williams in Propria Persona
48796 Taos Road
Cabazon, California 92230
Phone: 951-201-9935
Fax:  Not Available
email: send2.keith@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Royce Keith Williams
**Plaintiff**

**vs**

Riverside County Department of Public Social Services, Banning Police Department, Robert Fisher, Jeff Perry, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray,
**Defendant(s)**

**CASE NUMBER**

**ED CV 07 - 01632 ABC (OP)**

FIRST ~~SECOND~~ AMENDED COMPLAINT FOR DEPRIVATION  OF CIVIL RIGHTS

Title 42  U.S.C. 1983

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

NATURE OF THE ACTION..................................................................3

PARTIES...........................................................................................8

A. The Plaintiffs..............................................................................8
B. The Defendant(s).........................................................................8

JURISDICTION AND VENUE...........................................................11

Civil Rights Violation - 1

DOCKETED ON CM
APR 1 6 2008
BY_____ 202

PRELIMINARY STATEMENT.........................................................13

PLAINTIFF'S LEGAL THEORY AGAINST THE GRANT OF ABSOLUTE IMMUNITY OR QUALIFIED IMMUNITY OR QUASI-JUDICIAL IMMUNITY TO THE DEFENDANT(S)..........................................................15

ASSESING WHETHER THIS COURT SHOULD GRANT IMMUNITY TO ANY OF THE NAMED DEFENDANT(S)...........................................18

FACTUAL ALLEGATIONS.........................................................19

FIRST CAUSE OF ACTION: UNLAWFUL SEARCH AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983.......................................42

SECOND CAUSE OF ACTION:   FABRICATION OF EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983.......................................44

THIRD CAUSE OF ACTION:  FAILURE TO PROVIDE KNOWN EXCULPATORY EVIDENCE IN VIOLATION OF 42 U.S.C. § 1983.........46

FOURTH CAUSE OF ACTION: PERJURY IN VIOLATION OF 42 U.S.C. § 1983.......................................................................47

FIFTH CAUSE OF ACTION:  MALICIOUS PROSECUTION AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983.......................................48

SIXTH CAUSE OF ACTION:  IN VIOLATIONS OF 42 U.S.C. § 1983 (*MONELL V. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977)).........................50

SEVENTH CAUSE OF ACTION: VIOLATIONS OF 42 U.S.C. § 1983 (*MONELL V. DEP'T OF SOCIAL SERVS.*, 436 U.S. 658 (1977)).....................53

EIGHTH CAUSE OF ACTION: CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983...................................................................57

CONCLUSION AND FINAL ARGUMENTS...................................59

PRAYER FOR RELIEF.............................................................73

JURY DEMAND...................................................................................81

## NATURE OF THE ACTION

1.  This is a civil rights action for damages and injunctive relief under 42 U.S.C. § 1983, 42 28 U.S.C. 1343(a) (1) (2) (3) 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 1988(b), and the common laws of the State of California arising from a chilling and malicious acts of misconduct by the Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry, while acting in a civil conspiracy **"under color of law"**, outside the scope of their lawful authority, in violation of Plaintiff's constitutional rights under the 4th and 14th amendments.

2.  As a result of the combined unlawful actions of the Defendant(s), which resulted from two unlawful search and seizures, in Plaintiff's home, Plaintiff has been prosecuted in juvenile and criminal court for termination of his parental rights, and criminally for child abuse and neglect. Plaintiff's was falsely arrested and maliciously prosecuted by the defendant(s), which has resulted in Plaintiff losing his job, familial relationship with his wife, son and step daughter which has devastated the family. This malicious prosecution which has been brought and sustained against the Plaintiff over a period of more than one year based

on the fabrication of evidence and perjury by the defendants, the

Department of Public Social Services, the Banning Police Department,

Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff

Perry and has resulted in a miscarriage of justice against the Plaintiff.

3. From December 11, 2005 to the present date the Department of Public

Social Services, the Banning Police Department, Nicole Stolar, Alicia

Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry in their official

and individual capacity, individually and in concert, maliciously

conspired to bring false charges, of child abuse and neglect, against

Plaintiff.  The Department of Public Social Services, the Banning Police

Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert

Fisher and Jeff Perry knew that charges against the Plaintiff were false

and unsupported by the evidence with regard to Plaintiff.

4. The Department of Public Social Services, the Banning Police

Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert

Fisher and Jeff Perry charges against Plaintiff in the juvenile court and

criminal court can be easily contradicted by physical evidence,

documentary evidence and other witnesses.  In their rush to accuse the

innocent Plaintiff, the Department of Public Social Services, the Banning

Police Department, Nicole Stolar, Alicia Dickens, Robert Fisher and Jeff

Perry willfully ignored and were deliberately indifferent to overwhelming evidence of Plaintiffs' actual innocence.

5.   Instead, the Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry individually and in concert have made false allegations; fabricated evidence, committed perjury, had ex-parte communication with the juvenile court judge and have maliciously presented scientific evidence which is not only questionable but which is not based on any validated scientific technique.  The inflammatory reports presented by the Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry prejudiced the juvenile court judge to such a degree that plaintiff's due process rights were violated and he has not received a fair trial in the flawed juvenile dependency proceedings.

6.   The Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry, individually and in concert, conspired to conceal exculpatory evidence in order to charge and then prosecute Plaintiff on **"alleged facts"** they knew to be untrue or which was based upon

fabricated evidence manufactured pursuant to two unlawful search and seizures in plaintiff's home.

7. During the first unlawful search and seizure, detectives Robert Fisher, Jeff Perry and social worker Nicole Stolar unlawfully coerced entry into plaintiff's home after a tragic accidental drowning of plaintiff's five year old son Jason. Then in violation of plaintiff's constitutional rights under the 4th and 14th amendments, unlawfully interview plaintiff's son and unlawfully removed plaintiff's children without a warrant, court order or exigent circumstance.

8. During the second unlawful search ten or more unknown Banning, Ca police officers during the arrest of plaintiff's wife unlawfully read plaintiff's papers where he had attempted to file a complaint with the Department of Justice against the police detectives Robert Fisher, Jeff Perry and social worker Nicole Stolar for the first unlawful coerced involuntary consent search. The police officers also conducted a full search of plaintiff's home, looking in drawers, cabinets, the refrigerator, opening plaintiff's legally registered gun and checking registration, and generally looking in places not covered under the arrest warrant. This search was nothing more than a fishing expedition in violation of the warrant requirement. A lawful warrant must specify what is to be

searched for and where the officers may search.

9.   The Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry's actions are evidenced by a reckless and callous disregard for and deliberate indifference to Plaintiffs' constitutional rights and the defendant(s) responsibilities to the United States and California Juvenile Dependency System and to the United States and California Criminal Justice System.

10.  As a result of the Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry's actions, Plaintiff has suffered deprivations of the rights guaranteed to him under the Fourth and Fourteenth Amendments to the Constitution of the United States and he has suffered economic hardship, financial losses, emotional, and physical harm. Plaintiff has also suffered the separation from his wife and children, loss of marital relations for over one year, irreparable harm to his reputation and a devastating degradation to his quality of life.

11.  Moreover, because the defendant(s), Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry and the departments they work for have policies, customs, practices, and general misconduct issues

which raises a substantial risk of irreparable injury to other persons in the State of California and in particular, Riverside County, California, Plaintiff seeks the entry of an Order and Permanent Injunction, as set forth in further detail below, to protect all persons in the State of California and specifically in Riverside, County  to prevent such misconduct from ever happening again.

## THE PARTIES

### A. THE PLAINTIFF

**a.** Plaintiff Royce Keith Williams is a citizen and resident of, The State of California, and is presently residing at 48796 Taos Road, Cabazon, California.

### B. THE DEFENDANT(S)

**a.** Defendant, the Department of Public Social Services aka Child Protective Services aka (CPS), is and has been at all times relevant to this action as the Department with jurisdiction in the State of California in the capacity of the  Department responsible for child protection and placement with foster families in California.  In that capacity defendant serves as the supervisory arm of the social worker Defendant(s) Nicole Stolar and Alicia Dickens who work from the

defendants local office located at 161 W Ramsey, in Banning, California.

b. Defendant, Nicole Stolar is, and has been at all times relevant to this action as a citizen and resident of California. In the capacity of social worker assigned to handle immediate response cases, while working from the local office of the Department of Social Services aka (CPS), located at 161 W Ramsey in Banning, California.

c. Defendant Alicia Dickens, is, and has been at all times relevant to this action as a citizen and resident of California. In the capacity of social worker assigned to take interviews of parents and then write social study reports to present to the juvenile courts as evidence, while working from the local office of the Department of Social Services aka (CPS) located at 161 W Ramsey in Banning, California, .

d. Defendant Dr. Sandra Murray, is and has been at all times relevant to this action as a citizen and resident of California. In the capacity of a private pediatrician/(forensic pediatrician) **contracted** with the Department of Social Service aka (CPS) to provide care and emergency treatment for children suspected as being victims of child abuse. Her other duties include testifying before the court as a forensic pediatrician for the Department of Social Services. Dr.

Murray practices at 27800 Medical Center Road, Mission Viejo, California.

e.  Defendant Robert Fisher is, and has been at all times relevant to this action as a citizen and resident of California.  In the capacity of a police detective assigned as an investigator responsible to the local Banning Police Department, located at located at 361 W Ramsey, Banning, California.

f.   Defendant Jeff Perry is, and has been at all times relevant to this action as a citizen and resident of California.  In the capacity of a police detective assigned as an investigator responsible to the local office  Banning Police Department located at located at 361 W Ramsey, Banning, California .

g.  The Banning, California Police Department is and has been at all times relevant to this action as the Banning California Police Department with jurisdiction in the City of Banning California.  In their capacity as the Supervisory arm of the Banning, California police officers, Robert Fisher and Jeff Perry, who work from their local office at 361 W. Ramsey, with local jurisdiction in Banning, California.

## JURISDICTION AND VENUE

12.   Jurisdiction is invoked pursuant to 28 U.S.C. 1343(a) (1) (2) (3) and 42 U.S.C. 1983. This Court has original jurisdiction over Plaintiffs' constitutional and federal law claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

13.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiffs' federal claims.

14.   Venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(b)(1), (2), and (3), because most or all of the Defendant(s) reside, work or may be found in Riverside County, California and all or a substantial part of the events giving rise to these claims occurred in the Riverside County, California.

15.   This court has further jurisdiction because social workers, police and all other governmental employees may be sued for deprivation of civil rights under 42 U.S.C. 1983, if they are named in their official and individual capacity. Hafer v. Melo, (S.Ct.1991).

16.   Social workers or police officers **are not immune** for coercing or seizing a child from the parent without a warrant or court order.   **Calabretta v. Floyd (9th Cir. 1999)** Persons may not be seized without a court order or

being placed under arrest. Children may not be removed from their home or seized from their parent by social workers/DCS, or police without notice and a hearing unless the officials have a **reasonable** belief that the child is in '**imminent danger**'.

17.     California Government Code 820.21 provides that:

**(a)** Notwithstanding any other provision of the law, **the civil immunity of juvenile court social workers, child protection workers, and other public employees** authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code **shall not extend to any of the following**, if committed with **malice**:

(1) Perjury.
(2) Fabrication of evidence.
(3) Failure to disclose known exculpatory evidence.
(4) Obtaining testimony by duress, as defined in Section 1569 of the Civil Code, fraud, as defined in either Section 1572 or Section 1573 of the Civil Code, or undue influence, as defined in Section 1575 of the Civil Code.
(b) As used in this section, **"malice"** means conduct that is intended by the person described in subdivision (a) to cause injury to the Plaintiff or despicable conduct that is carried on by the person described in subdivision (a) **with a willful and conscious disregard of the rights or safety of others.**

18.     This court has further jurisdiction over the Department of Public Social Services and the Banning Police Department under California Government Tort Liability § 815.2(a) which makes a public entity

vicariously liable for injury caused by an act or omission of its employee(s) within the scope of his or her employment.

## PRELIMINARY STATEMENT

19. Plaintiff is bringing this complaint for actions performed "**under the color of law**" in violation of Plaintiff's constitutional rights and other laws which were clearly established at the time, which were outside the scope of the lawful authority of police detectives Robert Fisher, Jeff Perry, Nicole Stolar, Alicia Dickens, and Dr. Sandra Murray.

20. Plaintiff will show this court that the Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry are not entitled to absolute immunity, qualified immunity or quasi-judicial immunity, because while acting "**under color of law**", outside the scope of their lawful authority, the defendants violated the Plaintiff's constitutional rights or rights reserved to the Plaintiff under other clearly established laws existing at the time.

21. Three of named Defendant(s) Robert Fisher, Jeff Perry and Nicole Stolar, unlawfully coerced entry into Plaintiff's home, unlawfully interviewed Plaintiff's son Travis Lee Williams and then removed Plaintiff's children without a warrant or court order or **exigent** circumstance. Robert Fisher,

Jeff Perry or Nicole Stolar, did **NOT** seek to apply for or obtain a warrant or court order prior to removing plaintiff's son Travis Lee Williams or his half sister Tabitha Watak from their home in spite of the fact that the constitution of the United States and clearly establish law existing at the time, required a warrant or court order absent exigent circumstance or imminent danger.

22.    Alicia Dickens and Dr. Sandra Murray, willfully and maliciously participated in a civil conspiracy to deprive plaintiff of his constitutional rights by the use of fabricated evidence and perjury and the malicious creation of false or misleading reports presented to the court specifically intended to deprive plaintiff of his constitutional rights to parent his son free of government interference.

23.    Plaintiff will show that Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry while coming to a meeting of the minds, acted in collusion and in a civil conspiracy designed to maliciously deprive the plaintiff of his constitutional rights and other rights granted to plaintiff under laws clearly established at the time to parent his son free from government interference.

**PLAINTIFF'S LEGAL THEORY AGAINST THE GRANT OF ABSOLUTE IMMUNITY, QUALIFIED IMMUNITY OR QUASI-JUDICIAL IMMUNITY TO THE DEFENDANT(S)**

24.   Plaintiff recognizes as do most State and Federal courts that police officers, social workers and witnesses *may* be entitled to; absolute immunity or qualified immunity and in some special cases quasi-judicial immunity while acting **"under color of law"**, so long as they are acting within the scope of their lawful authority.

25.   However, as in the instant case, the acts committed by the defendants The Department of Public Social Services aka CPS, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry performed acts **"under the color of law"** which was outside the scope of their lawful authority must result in the loss of immunity.  These unlawful actions maliciously deprived plaintiff of his constitutionally guaranteed rights.  This court must **NOT** grant immunity to the Department of Public Social Services, the Banning Police Department, Nicole Stolar, Alicia Dickens, Dr. Sandra Murray, Robert Fisher and Jeff Perry in this case because plaintiff's claims are based on well established Constitutional and State law that defeats immunity for official who violate constitutional rights.

26. Private parties may commit acts **"under color of state law"** under certain circumstances; for example: **it has been held that a physician, who contracts with the state to provide medical care to inmates, acts under the "color of state law".** In Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970), the Court held that to act **"under color of state law"**, a **defendant need not be an officer of the state; it is sufficient that he/she "is a willful participant in joint activity with the State or its agents."** Id. at 152 (quoting U.S. v. Price, 383 U.S. 787, 794 (1966)); additionally the Court has also held that private persons who are authorized to exercise state authority are deemed to be acting **"under color of state law."** West v. Atkins, 487 U.S. 42, 54-55 (1988). In Atkins, the Court held that a private physician under contract with North Carolina to provide medical services for prisoners was acting **"under color of state law."** Id. at 57; accord Conner v. Donnelly, 42 F.3d 220, 225 (4th Cir. 1994) **(private physician acting under color of state law when treating prisoner under referral from prison physician);**

27. In the instant case Dr. Sandra Murray was **under contract with CPS,** to treat and diagnose children suspected as being victims of child abuse. Dr. Sandra Murray was also **contracted** as a **pediatrician/forensic**

**pediatrician.   CPS and their contracted employees act "under color of law".**

28.  Plaintiff alleges that Dr. Murray was acting **"under color of law"**, in performing her duties in the instant case and that she may not be treated **"simply as a witness"** for the purposes of granting immunity.  Dr. Murray was a willful participant and co-conspirator acting in collusion with the State or its agents in activities which were maliciously intended to deprive plaintiff of his constitutional rights under the 4th and 14th amendment.  These acts included the writing of a medical report which contained legal wording that Dr. Murray could only have obtained or been aware of by acting in collusion with the Department of Public Social Services or the social workers involved in this case and she was not simply testifying as a forensic pediatrician.  While acting in a civil conspiracy with the Department of Social Services, aka CPS and their employees, Dr. Murray willingly and knowingly participated in presenting false or misleading information to the juvenile court with the express intent to deprive plaintiff of his constitutional rights to parent his son free from governmental interference.

## ASSESSING WHETHER THIS COURT SHOULD GRANT IMMUNITY TO ANY OF THE OFFICIALS OR PRIVATE PARTIES IN THIS CASE

*I. Constitutional violation:*

29.   **[1]** In assessing whether a court should grant qualified immunity to a public official or private party, a court must first decide whether "the [official's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  **"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).**

30.   "The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law **ROGERS v. COUNTY OF SAN JOAQUIN** except in emergencies." *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001). Officials violate this right if they remove a child from the home absent **"information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury**. " *Id.* at 1106 (quoting *Wallis*, 202 F.3d at 1138). The Fourth Amendment also protects children from removal from their homes absent such a showing.  ***Doe v. Lebbos*, 348 F.3d 820, 827 n.9 (9th Cir. 2003).**  Officials, including social workers, who remove a child from its home without a warrant, **must have**

**reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant.** *Mabe*, **237 F.3d at 1108.**

31. Immunity is defeated if the official took the complained of action with malicious intention to cause a deprivation of rights, **or the official violated clearly established statutory or constitutional rights of which a reasonable person would have known.**

## FACTUAL ALLEGATIONS

32. Approximately 16 months prior to December 11, 2005, plaintiff brought his wife's daughter Tabitha to America, from Indonesia, after a horrific fire that killed plaintiff's wife's mother, Evi Watak, (Tabitha's grandmother), and Tabitha's two brothers Andikha and Emanuel, and three other women living in the grandmother's home.

33. Tabitha was burned on 65% of her body in a house fire in Indonesia and she was severely scarred and psychologically damaged when she arrived in America. Tabitha was the only survivor of this horrific fire that killed the only family she had ever known. When Tabitha came to America the plaintiff was aware of the physical damage to Tabitha, but he was not aware of the extent of the psychological problems until much later. Plaintiff believed that Tabitha was in generally good health otherwise.

34.   Somewhere between 9-13 months after Tabitha came to the plaintiff's home Tabitha revealed that she had been sexually abused since she was three years old in Indonesia by the mother's cousin. It also became pretty obvious that Tabitha was suffering psychological problems and physical problems including enuresis and encoprisis, and she refused to speak English in the parent's home.

35.   Prior to the house fire in Indonesia, the parents had been living at 1022 Juniper Place with their two sons and were very happy and had no problems other than dealing with Jason's Sotos syndrome.  The parents were coping well and did not have any real issues.

36.   After Tabitha arrived the parents were dealing with two special needs children.  One who had been severely burned (Tabitha) and was psychologically damaged and one who had Sotos Syndrome (Jason).  The parents were trying to find an Indonesian psychiatrist to help Tabitha, but were unable to locate one within 1000 miles of the home. The parents were planning to send Tabitha back to Indonesia in January in order to get a psychiatrist who spoke her dialect of Indonesian to treat her psychological problems.  They just wanted to give Tabitha a nice Christmas before she went back to Indonesia.

37.   At approximately twenty minutes until 7:00 a. m. on the morning of

December 11, 2005 at Plaintiff's residence located at 1022 Juniper Pl,

Banning, California, plaintiff's youngest son Travis, awoke his mother

and told his mother that plaintiff's five year old son Jason Williams had

managed to escape from the plaintiff's home.   Jason got out of the home

with the help of his then seven year old half-sister Tabitha Watak.

Tabitha used a pair of pliers that she had snuck out of the garage in order

to remove a lock from her bedroom window while the parents were

sleeping at their normal time.

38.   The parents made a brief search for Jason and then called 911.  The

emergency responders arrived almost immediately and then about 45

minutes later, Jason Leon Williams was found deceased in a neighbor's

swimming pool.

39.   The neighbor's swimming pool barrier fence, did not meet city or state

codes, and the police report stated that the two gates in the barrier fence

were not locked.

40.   Plaintiff states that upon information and belief the emergency

responders were on the scene from about 7:40 until about 10:00 a. m. that

morning.  The responders including police and firefighters had been

given full access to plaintiff's residence both inside and out for the entire

time they were there and **NONE** of the **50+** police or firefighters reported

plaintiff's children as being in **"imminent danger"** or **"exigent circumstance"**.

41.    At approximately three thirty that same afternoon two Banning, California police detectives, Robert Fisher and Jeff Perry came back to the home to investigate further.  The detectives initially encountered plaintiff's wife in the front yard.   The detectives requested plaintiff's wife to sign a form consenting for them to enter the home.  The detectives stated they only wanted to look at the window and back yard. Plaintiff's wife refused to consent multiple times telling the detectives to come back tomorrow, that she wanted to be left alone to pray and grieve.

42.    The detectives requested plaintiff's wife to go and get her husband saying they wanted to talk to him.  Plaintiff's wife came into the home and told her husband that the detectives wanted to speak with him and stated the detectives wanted to come into the home to look at the window and back yard.  Plaintiff's wife also stated to the plaintiff that she had refused to grant her consent and asked the plaintiff to do the same.

43.    The detectives asked the plaintiff for his consent to enter the home and the plaintiff tried to object many times, but each time the detective Robert Fisher interrupted the plaintiff and told him he could refuse to sign but they were going to just use a warrant and go in **"NO MATTER**

WHAT". The detectives refused to leave after Plaintiff objected as many as 10 or more times.

44. The detectives continued to badger the plaintiff for nearly 20 minutes with their request for consent, repeatedly telling the plaintiff he could refuse to sign the form but that if he did not sign the form, they would just **use** a warrant and go in "**No matter what**". Trying to be somewhat cooperative without consenting to entrance into his home, the Plaintiff told the detectives they could look at the back yard and window from his back yard but not from the inside of the house.

45. The detective then forcefully told the plaintiff "**NO, we want to see from the inside**". The detectives again told the plaintiff he could refuse to sign but that they were going in "**No matter what**".

46. Plaintiff then said to detective Fisher, "*Wait a minute, you mean to tell me that no matter what I say, no matter what I do, whether I like it or not and whether I sign your form or not you are going into my house*, "**NO MATTER WHAT**"! Detective Fisher then replied, "Yes we are going in "**NO MATTER WHAT**". Both the plaintiff and plaintiff's wife were in the front yard when they were refusing to give consent to the detectives to enter their home.

47. The plaintiff told the detective he could not read or understand the

consent form and that he was suffering sleep deprivation and emotional stress and grief from losing his son.  He told the detectives he had tried to read some information a little earlier and could not comprehend two words put together.

48.   Even though the plaintiff was being told he could refuse to sign, it was immediately rebutted, by the detectives saying were going in **"NO MATTER WHAT"**,  to the point that the plaintiff  did not feel he could refuse.  In the plaintiff's confused state of mind and grief, and after being told the detectives were going into his home **"NO MATTER WHAT"**, he eventually acquiesced to the two armed police detective's demands and involuntarily signed the consent form even though he could not read it, did not understand it and the detectives had not read it to him. The plaintiff was telling the detectives at the time he signed the form that he did not like it, that he and his wife just wanted to be left alone to pray and grieve.  The plaintiff told the detectives, **"I don't like it but I guess I can sign as long as you only look at the window and back yard"**. Plaintiff felt he had no real choice since they had refused to leave for such a long time and the two armed detectives were blocking plaintiff's entrance back into his home by strategically placing themselves between plaintiff and his front door.  Plaintiff did not feel free to leave since he

felt that based on the detectives position and posture that the two armed

detectives intended to block him from going back in his home.

49. After the unlawfully coerced entry, the detectives conducted a full search

of plaintiff's home, even though they had been told they could only look

at the window and back yard.

50. While looking at the window in Tabitha's room, detective Jeff Perry saw

that Tabitha had a bruise on her left ear. The bruise became visible when

Tabitha lay down on her bed to sleep and then her hair fell back exposing

the bruise.  Detective Jeff Perry then called the CPS immediate responder

Nicole Stolar to the scene to investigate.

51. Nicole Stolar responded to the call and entered the plaintiff's home

without identifying herself when challenged to do so by plaintiff's wife,

just stating she needed to see the detectives, and then Stolar proceeded to

the back yard where the detectives were.

52. The social worker and the detectives worked out a plan in the back yard

to remove the children without a warrant or court order in violation of

constitutional laws requiring them to apply for a warrant or court order

absent **"exigent circumstances"** or **"imminent danger"**.

53. Upon information and belief plaintiff states that in order to circumvent

the need for a warrant or court order and for the purpose of removing the

children, detective Robert Fisher, detective Jeff Perry and social worker

Nicole Stolar, decided to make an exaggerated false claim of exigency to

accomplish their goal of removing plaintiff's children.

54.   The detective Robert Fisher and the social worker Nicole Stolar

unlawfully interviewed plaintiff's four year old son Travis Williams over

his mother's objections, without a warrant, without a court order, absent

exigent circumstances and without the parent's permission.  Travis was

taken into his sister's bedroom and the parents were locked out during the

unlawful interview.

55.   There was no evidence that either parent had ever beaten any child or that

either parent had molested any child.  It has been well documented

during the court proceedings that Tabitha stated several times and has

continued to state that her brother Jason caused the questionable bruise

on her ear by hitting her with a broom.

56.   After the interview of Travis, the social worker Nicole Stolar and the

detective Robert Fisher came into the living room and identified Nicole

Stolar as a social worker.  Detective Fisher then told the parents he was

removing the children from the home.

57.   The social worker Nicole Stolar then began asking the parents to sign

some papers that the parents did not understand since they were in a state

of confusion and extreme grief.

58. After the social worker Nicole Stolar, identified herself the parents were asked to sign some papers that plaintiff barely remembers.  In any event, the parents had not consented to the interview of Travis Williams prior to the interview.

59. Tabitha was soundly sleeping in her parent's bed at the time the detective Robert Fisher decided to remove the children from their home, **she was not in any distress,** and Tabitha had been happily playing with her brother Travis for nearly 5 hours, prior to the detective's arrival.

60. Detective Fisher made a bold display in front of the parent's that it was his decision to remove the children and not the social worker's decision.

61. Upon information and belief, Plaintiff believes this was done because Nicole Stolar was aware she did not have the statutory authority to remove a child under these circumstances without a warrant or court order.

62. Nicole Stolar had a responsibility to stop the detective, or at least refuse to participate, when she clearly knew this was a violation of plaintiff's constitutional rights.  Nicole Stolar willingly participated in this conspiracy to remove plaintiff's son Travis Lee Williams from his home without a warrant or court order.  Nicole Stolar took custody of the

plaintiff's children from detective Fisher in plaintiff's front yard.

63. Nicole Stolar took pictures of Tabitha's ear with her cell phone and emailed them to Dr. Sandra Murray who determined from a cell phone picture and without any physical examination that Tabitha should be taken to the emergency room.

64. An unknown nurse involved in the treatment of Tabitha, for the bruise on her ear, called the plaintiff and told him that the treatment consisted of a warm rag followed by a cold rag. The purpose of this type of treatment is purely cosmetic in that it helps to keep the bruise from getting darker and may in some cases reduce the amount of time the bruise is visible. Tabitha had never complained that she was in any pain to either of the parents. No other treatment was ever required or provided, as far as the plaintiff is aware for any alleged serious physical injuries. It is plaintiff's understanding, that Tabitha has been seeing a psychiatrist. Plaintiff has stated all along that he had been seeking a psychiatrist for Tabitha just prior to her removal from plaintiff's home.

65. The unknown nurse also told the plaintiff that Tabitha had been placed in the mental ward because they did not have enough bed space to put her anywhere else.

66. The children were then placed in foster care and juvenile dependency

proceedings were commenced against the plaintiff and plaintiff's wife.

67.  The parents were called in to the CPS office to give a statement.  The statements were taken by Alicia Dickens and hand written into a notebook, without the aid of an electronic recording device.  When both parents questioned this method of interview, Alicia Dickens just stated that she preferred to do it that way.

68.  After the statements were provided, Alicia Dickens completely changed what was actually said by the parents and presented the first social study to the Juvenile Court during the Detention hearing as a complete work of fabrication.

69.  One of the most damaging statements in the social study was when Alicia Dickens asked the plaintiff if he had seen the bite marks on Tabitha. "The plaintiff's actual statement to Alicia Dickens was that he had not seen bite marks but that he had seen burn scars", which at the time were the marks that Alicia Dickens was referring to.   In a malicious act, Alicia Dickens wrote in her social study report that when the father was asked if he had seen the bite marks, that he replied he had seen the bite marks. Alicia Dickens knew this was a false statement and it was deliberately and maliciously put into the report in order to terminate plaintiff's parental rights to his only remaining son.  The social study report failed

to include the fact that plaintiff's son desperately wanted to come home to his mother and father.  The report stated that the plaintiff admitted to a criminal history, when the plaintiff was working at the Casino Morongo and had been passing background checks for twenty years and had no criminal history.  The fabricated social study report was nothing more than a malicious act of perjury by Alicia Dickens intended to deprive plaintiff of his constitutional rights to parent his son free from government interference done in collusion and conspiracy with Nicole Stolar, and Dr. Sandra Murray.

70. Dr. Sandra Murray wrote a medical report that seemed to allege child abuse but did not say who the abuser was or where any abuse had occurred.  The report made findings of probable causation for injuries even though Dr. Murray had not conducted any independent investigation to determine the cause.  Dr. Murray alleged that Tabitha had "**bite mark scars**" even though Dr. Murray has NO expertise in odontology.  It is notable that even when odontologist are shown pictures of known human bite marks they are not able to correctly identify them as human bite marks 63.5% of the time in a blind study.   The medical report also referenced by exact wording some of the codes in the WIC which only a social worker would have been aware of and which was needed to

support a petition to terminate parental rights.  The report was written

with a vagueness purposely designed to imply the guilt of the plaintiff or

his wife as a child abuser even though the plaintiff or his wife was not

actually named.

71.   The Defendant(s) Nicole Stolar, Alicia Dickens, Dr. Sandra Murray and

police detective Robert Fisher continued to allege that the round scars on

Tabitha's body were "**bite mark scars**" even though the plaintiff had

repeatedly stated the scars were burn scars from the house fire in

Indonesia and had shown them pictures and video evidence to prove his

claim.

72.   The structure and content of the social study was written in a way that

would lead any reasonable person to conclude that, the only way this

report could have been written, with the legal wording and content

contained in it, would have been if it were written maliciously in

collusion and conspiracy with the social workers, Nicole Stolar and

Alicia Dickens in an act of perjury and fraud on court.

73.   The medical report was not the work of someone performing as a medical

witness but was instead the work of a co-conspirator, intent to violate

petitioner's constitutional rights to parent his son.  Plaintiff's complaint

in this case is not about the content of Dr. Murray's medical report or the

actual content of her testimony as a witness but instead the fact that the

medical report was written in collusion and civil conspiracy with the

social workers while acting **"under color of law"** outside the scope of

her lawful authority, specifically with the intent to deprive the plaintiff of

his constitutional rights to parent his son free of government interference.

74.   The first fabricated or misleading social study report was used to

maliciously influence and induce the juvenile court judge to continue

detention of plaintiff's son Travis.  The social study report maliciously

failed to provide known exculpatory evidence and was written in a

malicious manner using fabrication and outright perjury designed to

inflame the judge.  In fact Judge Becky Lynn Dugan actually made the

statement at the beginning of the Detention Hearing that she was inclined

to terminate plaintiff's parental rights **based solely on the seriousness of**

**the charges,** before even hearing the defense.

75.   The second social study report was so full of fabrication or misleading

statements, that a reasonable person could only perceive this as a

malicious and intentional perjury committed by Alicia Dickens designed

to violate plaintiff's constitutional rights.

76.   Both social study reports were given to the plaintiff and his attorney just

20 minutes prior to the hearings.  This untimely notice amounted to a

substantive due process error.  The second fabricated social study report was maliciously used to deny reunification services to the plaintiff when the social worker knew that the denial of reunification services would absolutely insure that the plaintiff could not use bonding as a reason not to terminate his rights since the law requires contact to establish bonding. Plaintiff desperately desired to see his son Travis and Travis had indicated on the one and only visit that he wanted to go home.

77.  The Detention Hearing lasted less than 10 minutes and the Jurisdiction/Disposition Hearing lasted less than 15 minutes.  Plaintiff's appointed counsel did not object to the untimely social study reports in either case and she did not perform any investigation of plaintiff's case or test any of the evidence provided to the court by the defendant the Department of Public Social Services.  Plaintiff's court appointed attorney signed an affidavit stating that she had 550 cases at the time and that she had performed no investigation and that she knew this was a complicated case.  Plaintiff was hung out to dry in the courtroom by a completely one sided presentation of the case.  No one tested or challenged the prosecutors theories that the marks alleged to be bite marks were as plaintiff had stated all along, in fact burn scars.

78.  Tabitha stated in the CPS interview that her mother bit her and pulled her

hair and pushed her head into the floor.  This was a true statement but it did not happen in America and was not an act of child abuse.  Before the fire in Indonesia Tabitha was standing between her mother and her grandmother in the grandmother's home in Indonesia.  The grandmother had stolen some money from the mother and they got into a fight about it. The grandmother pulled a knife and Tabitha's mother pulled her out of the way, accidentally pulling her hair.  When Tabitha tried to get up the mother pushed her back down to keep her from getting cut.  Plaintiff had related this story to detective Fisher during the interview of plaintiff.

79.   Tabitha also alleged her mother bit her.  This was also true, but taken out of context, time and location.  While in Indonesia Tabitha bit her mother's finger so hard you could see the bone.  The mother bit Tabitha on the finger to show her that it hurt and to make her let go, but did not break the skin.  This was not the alleged biting that the social worker was trying to prove.   The plaintiff had related this story to detective Fisher during the interview of plaintiff.

80.   The allegations made in the juvenile courtroom were based on interviews of Tabitha taken during an unlawful detention without an Indonesian interpreter.  The detention was unlawful since the seizure and removal of Tabitha was unlawful without a warrant or court order.

81.   Upon information and belief the plaintiff suspects the interview questions may have been asked with leading or suggestive questions.   Plaintiff is certain that no Indonesian interpreter was present during the interviews since CPS stated that as a fact.  Upon information and belief, plaintiff states that the statements taken from Tabitha were out of context and without merit as to the prosecution of the plaintiff, since the event occurred in Indonesia and plaintiff was still in America when these incidents took place and he could not have taken part in or been held responsible for these actions.

82.   All of the original bite mark allegations in the juvenile proceedings were made without consulting an odontologist first.  The social study reports and the medical reports repeatedly referred to "**bite mark scars**".  Bite marks leave bruises not scars.  The multiple alleged bite mark scars would have meant that skin would have had to be removed in order to form a scar.  Fires leave "**scars**".

83.   Plaintiff knows for certain that Tabitha never received a bite mark that removed skin.

84.   Tabitha was not modest and plaintiff had sometimes seen Tabitha without clothing but he never saw evidence of bruises or scars that would have indicated that anyone had bitten Tabitha or abused her.

85.   Plaintiff was appointed ineffective assistance of counsel in the juvenile court action and had no fair opportunity to object to the multiple due process violations committed against him, even though he was demanding his attorney raise those objections from the beginning of the proceedings.

86.   Plaintiff has encountered major resistance from any of his court appointed attorneys with regard to his claims of substantive due process violations and ineffective assistance throughout the proceedings.

87.   Michelle Morris, plaintiff's juvenile court attorney stated flatly to plaintiff that she could not and would not raise due process issues in Judge Becky Lynn Dugan's courtroom. Plaintiff then tried to get his wife's attorney Melvin Friedland to raise the issue of due process. Plaintiff was told that due process issues could not be raised in juvenile court.  Plaintiff then contacted David Beauvais a civil rights attorney in Oakland, California who told him due process claims could be raised in any court but that he would not take the case on contingency.  Plaintiff complained again to his appellate attorney Christopher Booth who told the plaintiff that the due process issue could not be raised since it was outside the court record.

88.   Plaintiff's present appellate attorney Patti L. Dikes has raised the issue of

ineffective assistance, but now the State Court appellate judges are refusing to listen saying that plaintiff had lost his opportunity to raise these objections since they could have been raised at an earlier time.

89. Plaintiff ask this court to find that plaintiff has not had a fair opportunity to raise his claims of ineffective counsel or due process violations at an earlier time, in violation of his substantive due process rights, by reason of the reluctance of plaintiff's court appointed counsel to raise these claims on his behalf and by reason that the case was a cut out case that expedited the proceeding so fast that the plaintiff was denied due process in the lower court.

90. The matter of ineffective assistance and substantive due process violations is relative to this case to show how Defendant(s) violation of plaintiff's constitutional rights has resulted in a miscarriage of justice and cause plaintiff irreparable harm at the hands of the the Department of Public Social Service aka CPS, the Banning Police Department, Robert Fisher, Jeff Perry, Nicole Stolar, Alicia Dickens and Dr. Sandra Murray.

91. Right after the 366.26 hearing plaintiff's wife's attorney Melvin Friedland told plaintiff that he had witnessed the Department of Public Social Services aka CPS have ex-parte communication with Judge Becky Lynn Dugan prior to the Jurisdiction/Disposition Hearing.  Mr. Friedland

did not know what the conversation was about but he was concerned enough about it to mention it to the plaintiff.

92. Sometime after the Jurisdiction/Disposition Hearing, detective Fisher called the parents and told them that he suspected that someone had bitten Tabitha and he wanted to come and take bite mark impressions of the plaintiff and his wife. The plaintiff and his wife agreed to cooperate and the detective came and asked the couple to bite down on Styrofoam cups.

93. A few days later the detective called and said the bite mark impressions on the cups were not good enough and that they needed to make mouth impressions of the parents. The couple agreed and went to the police station where an odontologist by the name of Dr. Greg Golden made the mouth impressions. During the impressions Dr. Golden broke one of plaintiff's wife's teeth. Odontology is not based on any validated scientific techniques and is considered junk science in the scientific community.

94. A short time later detective Fisher called the parents in for a formal interview. Detective Fisher told the plaintiff that he had been excluded from the bite mark impressions and therefore was not a suspect in the alleged biting of Tabitha. Detective Fisher then stated that the plaintiff's

wife was guilty of biting her daughter and that he had proof that she had

bitten her.  Detective Fisher told the plaintiff that he should come forth

with any information he had regarding his wife biting Tabitha.  The

plaintiff told the detective that he did not believe him and that he had no

knowledge of his wife biting anyone.  He stated to the detective that he

would have to show him some proof if he wanted the plaintiff to believe

his wife had bitten Tabitha.  The detective stated that he did not have to

show the plaintiff anything.  He then stated that the plaintiff could see the

pictures from the DA's office after he arrested her.  The plaintiff told the

detective if you want me to believe you then you need to show me the

pictures. The detective repeated he did not have to show the plaintiff

anything.  Plaintiff told the detective he thought he was "full of shit".

95.   Detective Fisher then stated you should tell me what you know so I can

arrest her now.  That will save you the embarrassment of me coming to

your house and arresting your wife in front of your neighbors.  I am

going to arrest her tomorrow anyway.  Detective Fisher did not arrest

plaintiff's wife the following day.

96.   Plaintiff believes it was March 2006 when the police made the bite mark

impressions and took the parents interview.  It was August 2006 before

detective Fisher returned and arrested plaintiff's wife.

97.   In August of 2006, plaintiff's wife was arrested for negligence and child

abuse.  During the arrest there were as many as 10 or more police officers

present.  The police officer's conducted a second unlawful full search of

plaintiff's home.  The arrest warrant did not authorize the officers to

conduct a fishing expedition.  The officers looked in closets, drawers,

refrigerator, under beds and through plaintiff's personal papers even

checking the registration of plaintiff's .270 rifle.  None of these items

were in plain view.  The officers opened plaintiff's computer and looked

in places clearly not covered by the warrant.  A legal search warrant must

designate the exact items to be searched for and where the officers may

look.  An arrest warrant usually on allows a search of the person being

arrested and the immediate area around that person.  The arrest warrant

did not authorize an unrestricted search by the Banning Police

Department.

98.   Plaintiff learned that the Banning Police Department planned to issue an

arrest warrant for him so he made financial arrangements and waited

until the arrest warrant was actually issued.  When the warrant was

issued, Plaintiff immediately turned himself in and then bailed himself

out.  Seven days later the plaintiff was re-arrested for the same charges

and released about 24 hrs later when the police OR department claimed